IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| MILDRED WHITTIER A/N/F | § | |
| AND ATTORNEY IN FACT FOR | § | |
| JULIUS WHITTIER | § | |
| *Plaintiffs* | § | CIVIL ACTION NO. __1:14-cv-978__ |
| | § | |
| v. | § | |
| | § | |
| | § | |
| NATIONAL COLLEGIATE | § | |
| ATHLETIC ASSOCIATION | § | |
| *Defendant* | § | JURY DEMANDED |

## PLAINTIFFS' ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF THIS COURT:

COME NOW Mildred Whittier a/n/f And Attorney in Fact for Julius Whittier and files this Original Complaint against National Collegiate Athletic Association and in support thereof would show as follows:

## I.    INTRODUCTION

1.    This action is brought by a former National Collegiate Athletic Association ("NCAA") football player who seeks damages for a latent brain injury, early onset Alzheimer's disease, caused by repeated traumatic head impacts suffered by him in the period during which he played NCAA football between 1960 and 2014. These claims are brought for personal injury damages on behalf of JULIUS WHITTIER, a former NCAA football player for the University of Texas, an NCAA member institution. The allegations herein, except as to the Plaintiff, are based on information and belief.

## II.     JURISDICTION AND VENUE

2.     This Court has original diversity jurisdiction over this action under 28 U.S.C. §1332(a) and (d) in that this suit is a class action in which the amount in controversy exceeds $5,000,000.00 exclusive of interest and costs, in which numerous members of the proposed class are citizens of diverse jurisdictions.

3.     This Court has personal jurisdiction over the Plaintiffs because Plaintiff JULIUS WHITTIER submits to the Court's jurisdiction.  This Court has personal jurisdiction over the NCAA because the NCAA conducts substantial business in the District.  Moreover, a substantial part of the events or omissions giving rise to the claims asserted here occurred in this District.

4.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), (c) and (d), because a substantial part of the events or omissions giving rise to the claims asserted here occurred in this District, and the NCAA resides, is found, has agents, or conducts substantial business in this District (and did so during the Class Periods).

## III.     THE PARTIES

5.     Plaintiff JULIUS WHITTIER resides in Plano, Texas.  Mr. Whittier played football for the University of Texas from 1969-1972.  He played as an offensive lineman and tight end.  During his college career he experienced repeated traumatic head impacts.  Mr. Whittier was diagnosed with early onset Alzheimer's disease on or about August 30, 2012.  Mr. Whittier believes that he suffered repeated traumatic head impacts over his college career, but because of his current condition, Mr. Whittier is unable to recall any incidences of head impacts.  However, upon information belief, Mr. Whittier submits there to have been many such impacts during his career, but he cannot recall them with specificity.

2

6.     Defendant NATIONAL COLLEGIATE ATHLETIC ASSOCIATION is an unincorporated association that acts as the governing body of college sports. Its principal office is located at 700 W. Washington Street, P.O. Box 6222, Indianapolis, Indiana 46206-6222. National Collegiate Athletic Association does not maintain a registered agent in and for the State of Texas and may be served by serving the Secretary of State of the State of Texas, who shall then mail a copy of the summons and Complaint to the National Collegiate Athletic Association's home office at 700 W. Washington Street, P.O. Box 6222, Indianapolis, Indiana 46206-6222 by registered mail or certified, return receipt requested.

## IV.     CLASS ACTION ALLEGATIONS

7.     Plaintiff JULIUS WHITTIER is a representative of a class defined by Fed. R. Civ. P. 23(b)(2) and brings this action for monetary damages for himself and the Class identified herein with respect to which the NCAA has acted or refused to act on grounds that apply generally to the Class.

8.     The personal injury class is defined as:

> All former NCAA football players residing in the U.S. who played from 1960 – 2014 who did not go on to play professional football in the NFL and who have been diagnosed with a latent brain injury or disease.

9.     The members of the Class are so numerous and geographically widely dispersed that joinder of all members in impracticable. There are questions of law and fact common to the members of this Class. Plaintiffs' claims are typical of the claims of the members of the Class that he represents, and Plaintiff will fairly and adequately protect the interest of the Proposed Class.

10.    Questions of law and fact common to the members of the Class predominate over any questions affecting only individual members of the Class. These include the following:

Whether Plaintiff and the Class are entitled to damages as a class for the injuries sustained as a result of repeated traumatic head impact from playing NCAA college football;

Whether Defendants' conduct was tortious and caused Plaintiff and members of the Class to be at an increased risk of latent brain injury or disease;

Whether the Defendants' failure to warn the Plaintiff and the Class of the increased risk of latent brain injury or disease caused by repeated traumatic head impact breached its duty to protect NCAA football players;

Whether members of the class are ascertainable;

Whether the Defendants' failure to establish known head injury protocol to identify concussive or subconcussive brain injury and protect the football players from exposure to injury was a breach of Defendants' duty to protect NCAA football players;

Whether the Defendants' failure to provide medical monitoring to victims of football related repeated traumatic head impact during and after their careers breach the Defendant's duty to protect NCAA football players.

## V.    FACTUAL ALLEGATIONS

### A.    The NCAA Breached its Duty to Protect NCAA Football Players

11.    Historians report that the very existence of the NCAA evolved from the actions of President Teddy Roosevelt, who at the end of the 1905 college football season summoned the Presidents of Harvard, Yale and Princeton to the White House to call for reform of the game to prevent brutality and unsportsmanlike conduct. In 1905, 18 youths had died playing football and there were strong calls to ban the game. Roosevelt's plea to the three university presidents created momentum for health and safety reform of college football that lead to the formation of the Intercollegiate Athletic Association for the United States in 1906, which assumed the name NCAA in 1910. Historians report that this specific concern for safety of college football players led to the creation of the NCAA. From the term of the 20th century to the present, the NCAA has

assumed a duty to NCAA athletes to protect their health and safety. These duties were confirmed over the decades and are reflected in the NCAA's constitution.

12.     The NCAA's constitution states that college athletics shall be conducted in a manner designed to protect the physical and educational wellbeing of college athletes. Article 2.2 of the NCAA Constitution specifically addresses the "Principle of Student-Athlete Well-Being," and provides in pertinent part:

> **2.2     The Principle of Student-Athlete Well-Being**
> Intercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational well-being of the student-athletes. *(Revised: 11/21/05).*
>
> &ast;&ast;&ast;
>
> **2.2.3   Health and Safety**
> It is the responsibility of each member of the institution to protect the health of, and provide a safe environment for, each of its participating student-athletes. *(Adopted: 1/10/95).*

13.     Article 2, §2.8.2 of the NCAA's Constitution further states that the NCAA "shall assist the institution in its efforts to achieve full compliance with all rules and regulations …." This responsibility is reiterated on the NCAA's website, which places leadership responsibility on health and safety issues with the NCAA.

14.     Furthermore, in its annually published Sports Medicine Handbook, the NCAA explicitly states that "student-athletes rightfully assume that those who sponsor intercollegiate athletics have taken reasonable precautions to minimize the risks of injury from athletics participation."

15.     The NCAA has breached its duty to protect college football players in the face of long-standing and overwhelming evidence regarding the need to do so. The NCAA has ignored this duty and profited immensely from its inaction and denial, all to the detriment of the players.

16.     The NCAA has failed to educate its football-playing athletes of the long term, life-altering risks and consequences of head impacts in football. They have failed to establish known protocols to prevent, mitigate, monitor, diagnose and treat brain injuries. As knowledge of the adverse consequences of head impacts in football has grown, the NCAA has never gone back to its former college football players to offer education, medical monitoring or medical treatment. In the fact of their overwhelming and superior knowledge of these risks, as compared to that of the athlete, the NCAA's conduct constitutes negligence and reckless endangerment.

17.     Therefore, Plaintiff seeks compensation to cover medical care for the diagnosis treatment of concussive head injuries sustained by Plaintiff and the Class as a former college football players.

**B.    Head Injuries, Concussions, and Neurological Damage**

18.     Medical and scientific literature has documented for many decades that repetitive and violent jarring of the head or impact to the head can cause Mild Trauma Brain Injury "MTBI" with a heightened risk of long term, chronic neuro-cognitive sequelae.

19.     For example, Dr. Bennet Omalu, a renowned neuropathologist at the University of California, summarized the history of knowledge of "Head and Other Injuries in Youth, High School, College, and Professional Football," in his testimony before the U.S. Congress as follows:

> We have known about concussions and the effects of concussions in football for over a century. Every blow to the head is dangerous. Repeated concussions and sub-concussions both have the capacity to cause permanent brain damage. During practice and during games, a single player can sustain close to one thousand or more hits to the head in only one season without any documented or reported incapacitating concussion. Such repeated blows over several years, no doubt, can result in permanent impairment of brain functioning especially in a child.

20.     The American Association of Neurological Surgeons (the "AANS") has defined a concussion as "a clinical syndrome characterized by an immediate and transient alteration in brain function, including an alteration of mental status and level of consciousness, resulting from mechanical force or trauma."  The AANS defines traumatic brain injury ("TBI") as:

> a blow or jolt to the head, or a penetrating head injury that disrupts the normal functions of the brain.  TBI can result when the head suddenly and violently hits an object, or when an object pierces the skull and enters brain tissue.   Symptoms of a TBI can be mild, moderate or severe, depending on the extent of damage to the brain.  Mild cases may result in a brief change in mental state or consciousness, while severe cases may result in extended periods of unconsciousness, coma or even death.

21.     The NCAA has known or should have known for many years that MTBI generally occurs when the head either accelerates rapidly and then is stopped, or is rotated rapidly  The results frequently include, among other things, confusion, blurred vision, memory loss, nausea, and sometimes unconsciousness.

22.     The NCAA has known or should have known for many years that medical evidence has shown that symptoms of MTBI can appear hours or days after the injury, indicating that the injured party has not healed from the initial blow.

23.     The NCAA has known or should have known for many years that once a person suffers an MTBI, he is up to four times more likely to sustain a second one.  Additionally, after suffering even a single sub-concussive or concussive blow, a lesser below may cause MTBI, and the injured person requires more time to recover.

24.     The NCAA has known or should have known for many years that college football players and their families were unaware of the serious risk posed to the players' long-term cognitive health, caused by repeated head impacts while playing football.

25.     The NCAA has known or should have known for many years that clinical and neuro-pathological studies by some of the nation's foremost experts demonstrate that multiple head injuries or concussions sustained during a football player's career can cause severe cognitive problems such as depression, early-onset dementia, and early onset Alzhiemers.

26.     The NCAA has known or should have known that many years that published peer reviewed scientific studies have shown that repeated traumatic head impacts (including sub-concussive blows and concussions) cause ongoing and latent brain injury.  These injuries have been documented and associated with sports-related head impacts in both football and boxing.

27.     The NCAA has known or should have known for many years that neuropathology studies, brain imaging tests, and neuropsychological tests on many former football players have established that football players who sustain repetitive head impacts while playing the game have suffered and continue to suffer brain injuries that result in any one or more of the following conditions: early-onset Alzheimer's disease, dementia, depression, deficits in cognitive functioning, reduced processing speed, attention, and reasonable, loss of memory, sleeplessness, mood swings, personality changes, and the debilitating and latent disease known as Chronic Traumatic Encephalopathy ("CTE").  CTE is also associated with an increased risk of suicide.

28.     The NCAA has known or should have known for many years that CTE is found in athletes, including football players and boxers, with a history of repetitive head trauma. Published papers have shown that this condition in prevalent in retired professional football players who have a history of head injury.  The changes in the brain caused by repetitive trauma are thought to begin when the brain is subjected to that repetitive trauma, but symptoms may not appear until months, years, or even decades after the last traumatic impact or the end of active athletic involvement.

29.     Published peer-reviewed scientific studies have shown that concussive and sub-concussive head impacts while playing football are linked to significant risks of permanent brain injury.

**C.      The NCAA Was in a Superior Position of Knowledge and Control.**

30.     The NCAA's accumulated knowledge about head injuries to football players, and the associated health risks therefrom, was at all times superior to that available to the former college football players.

31.     From its inception, the NCAA had a duty to protect football players from health and safety risks.  The NCAA held itself out as acting in the players' best interests.

32.     Players and their families have relied on the NCAA to disclose relevant risk information and protect their health and safety.

33.     For decades, the NCAA failed to act to educate its college football players and provide needed medical monitoring.

**D.      The NCAA Knew the Dangers and Risks Associated with Repetitive Head Impacts and Concussions.**

34.     For decades, the NCAA has been aware that multiple blows to the head can lead to long-term brain injury, including but not limited to memory loss, dementia, depression, and CTE and its related symptoms.

35.     In 1928, pathologist Harrison Martland described the clinical spectrum of abnormalities found in "almost 50 percent of fighters [boxers] . . . if they ke[pt] at the game long enough" (the "Martland study").  The article was published in the *Journal of the American Medical Association*.  The Martland study was the first to link sub-concussive blows and "mild concussions" to degenerative brain disease.

36. In 1937, the American Football Coaches Association published a report warning that players who suffer a concussion should be removed from sports demanding personal contact.

37. In 1948, the New York State Legislature created the Medical Advisory Board of the New York Athletic Commission for the specific purpose of creating mandatory rules for professional boxing designed to prevent or minimize the health risks to boxers. After a three years study, the Medical Advisory Board recommended, among other things, (a) an accident survey committee to study ongoing accidents and deaths in boxing rings; (b) two physicians at ring-side for every bout; (c) post-bout medical follow-up exams; (d) a 30-day period of no activity following a knockout and a medical follow-up for the boxer, all of which was designed to avoid the development of "punch drunk syndrome," also known at the time as "traumatic encephalopathy"; (e) a physician's prerogative to recommend that a boxer surrender temporarily his boxing license if the physician notes that boxer suffers significant injury or knockout; and (f) a medical investigation of boxers who suffer knockouts numerous times.

38. The recommendations were codified as rules of the New York State Athletic Commission.

39. In or about 1952, the *Journal of the America Medical Association* published a study of encephalopathic changes in professional boxers.

40. The same year, an article published in the *New England Journal of Medicine* recommended a three-strike rule for concussions in football (*i.e.*, recommending that players cease to play football after receiving their third concussion).

41. In 1961, Drs. Seral and Jaros looked at the heightened incidence of chronic encephalopathy in boxers and characterize the disease as a "Parkinsonian" pattern of progressive decline.

42.     A 1963 study by Drs. Mawdsley and Ferguson found that some boxers sustain chronic neurological damages as a result of repeated head injuries. The damage manifested in the form of dementia and impairment of motor function. *See* "Neurological Disease in Boxers," *Lancet* 2:795-81.

43.     A 1967 study examined brain activity impacts from football by utilizing EEG to read brain activity in game conditions, including after head trauma. *See* Drs. Hughes and Hendrix, "Telemetered EEG from a Football Player in Action," *Electroencephalography & Clinical Neurophysiology* 24:183-86.

44.     In 1969 (and then again in the 1973 book entitled *Head and Neck Injuries in Football*), a paper published in the *Journal of Medicine and Science in Sports* by a leading medical expert in the treatment of head injuries recommended that any concussive event with transitory loss of consciousness requires the removal of the football player from play and requires monitoring.

45.     In 1973, Drs. Corsellis, Bruton and Freeman-Browne studied the physical neurological impact of boxing. This study outlined the neuropathological characteristics of "Dementia Publistica" ("DP"), including loss of brain cells, cerebral atrophy, and neurofibrillary tangles.

46.     A 1973 study by Drs. Gronwall and Wrightson looked at the cumulative effects of concussive injuries in non-athletes and found that those who suffered two concussions took longer to recover that those who suffered from a single concussion. The authors noted that these results could be extrapolated to athletes given the common occurrence of concussions in sports.

47.     In the 1960s and 1970s, the development of the protective face mask in football allowed the helmeted head to be used as a battering ram. By 1975 the number of head and neck

injuries from football that resulted in permanent quadriplegias in Pennsylvania and New Jersey lead to the creation of the National Football Head and Neck Registry, which was sponsored by the National Athletic Trainers Association and the Sports Medicine Center at the University of Pennsylvania.

48.     In 1973, a potentially fatal condition known as "Second Impact Syndrome" – in which re-injury to the already-concussed brain triggers swelling that the skull cannot accommodate – was identified.  It did not receive this name until 1984.

49.     In the early 1980s, the Department of Neurosurgery at the University of Virginia published studies on patients who sustained MTBI and observed long-term damage in the form of unexpected cognitive impairment.  The studies were published in neurological journals and treatises within the United States.

50.     In 1982, the University of Virginia and other institutions conducted studies on college football teams that showed that football players who suffered MTBI suffered pathological short-term and long-term damage.  With respect to concussions, the same studies showed that a person who sustained one concussion was more likely to sustain a second, particularly if that person was not properly treated and removed from activity so that the concussion symptoms were allowed to resolve.

51.     The same studies showed that two or more concussions close in time could have serious short-term and long-term consequences in both football players and other victims of brain trauma.

52.     In 1986, Dr. Robert Cantu of the American College of Sports Medicine published Concussion Grading Guidelines, which he later updated in 2001.

53.     By 1991, three distinct medical professionals/entities – Dr. Robert Cantu of the American College of Sports Medicine, the American Academy of Neurology, and the Colorado Medical Society – developed return-to-play criteria for football players suspected of having sustained head injuries.

54.     The NCAA implemented an injury surveillance system in 1982. In 1994, Randall W. Dick, Assistant Director of Sports Science for the NCAA, authored an article entitled "A Summary of Head and Neck Injuries in Collegiate Athletics Using the NCAA Injury Surveillance System" published by the American Society for Testing and Materials. The article identified concussions as the most prevalent type of head injury and noted that evaluation of concussions may be a first step to the prevention of severe injuries. The author cautioned that "[m]edical personnel should be educated on the diagnosis and treatment of such injuries in all sports and rules protecting the head and neck should be enforced." In spite of this admonition, the NCAA did not proceed to educate its active football players on the long term risks of concussions, nor provide necessary medical monitoring. Furthermore, the NCAA never reached out to its former football players to educate them or provide necessary medical monitoring.

55.     In 1996, the NCAA Sports Science Safety Subcommittee on Competitive Safeguards and Medical Aspects of Sports discussed the concussion data in football and other sports and recognized the football helmet would not prevent concussions. No further steps were taken to educate present or former NCAA football players regarding the risks of concussions, or to provide needed medical monitoring.

56.     In 1999, the National Center for Catastrophic Sport Injury Research at the University of North Carolina conducted a study involving eighteen thousand (18,000) collegiate

and high school football players. The research showed that once a player suffered one concussion, he was three times more likely to sustain a second in the same season.

57.     A 2000 study, which surveyed 1,090 former National Football League ("NFL") players, found that more than sixty (60) percent had suffered at least one concussion, and twenty-six (26) percent had suffered three (3) or more, during their careers. Those who had sustained concussions reported more problems with memory, concentration, speech impediments, headaches, and other neurological problems than those who had not been concussed.

58.     Also in 2000, a study presented at the American Academy of Neurology's 52nd Annual Meeting and authored by Dr. Barry Jordan, Director of the Brain Injury Program at Burke Rehabilitation Hospital in White Plains, New York, and Dr. Julian Bailes, surveyed 1,094 former NFL players between the ages of 27 and 86 and found that: (a) more than 60% had suffered at least one concussion in their careers, with 26% of the players having three or more and 15% having five or more; (b) 51% had been knocked unconscious more than once; (c) 735 of those injured said they were not required to sit on the sidelines after their head trauma; (d) 49% of the former players had numbness or tingling; 28% had neck and cervical spine arthritis; 31% had difficulty with memory; 16% were unable to dress themselves; 11% were unable to feed themselves; and eight (8) suffered from Alzheimer's disease.

59.     A 2001 report by Dr. Frederick Mueller that was published in the *Journal of Athletic Training* reported that a football-related fatality has occurred every year from 1945 through 1999, except for 1990. Head-related deaths accounted for 69% of football fatalities, cervical spinal injuries for 16.3%, and other injuries for 14.7%. High school football produced the greatest number of football head-related deaths. From 1984 through 1999, sixty-nine (69) football head-related injuries resulted in permanent disability.

60. In 2004, a convention of neurological experts in Prague met with the aim of providing recommendations for improvement of safety and health of athletes who suffer concussive injuries in ice hockey, rugby, football, and other sports based on the most up-to-date research. These experts recommended that a player never be returned to play while symptomatic, and coined the phrase, "when in doubt, sit them out."

61. This echoed similar medical protocol established by a Vienna conference in 2001. These two conventions were attended by predominately American doctors who were experts and leaders in the neurological field.

62. In 2004, the NCAA "injury surveillance system" documented a high rate of concussions in football and other sports. No action was taken by the NCAA to respond to this data in terms of educating former players or providing needed medical monitoring.

63. The National Athletics Trainers Association ("NATA") published concussion management guidelines in 2004 repeating the need for return-to-play protections and symptom monitoring as earlier medical recommendations had outlined.

64. The University of North Carolina's Center for the Study of Retired Athletes published survey-based papers in 2005 through 2007 that found a strong correlation between depression, dementia, and other cognitive impairment in NFL players and the number of concussions those players had received.

65. The chart on the following page, which was excerpted from an article in the 2010 *New England Journal of Medicine* entitled Traumatic Brain Injury – Football, Warfare, and Long-Term Effects, shows that even mild "traumatic brain injury" ("TBI") can have lasting consequences that are manifested later in the football player's life.



Spectrum of Pathologic Features and Outcomes of Traumatic Brain Injury (TBI).

In the left inset, Bielschowsky silver stain shows intraneuronal and extracellular neurofibrillary tangles in temporal cortex from a retired boxer with dementia pugilistica.[1] The right inset shows diffuse Aβ plaque deposits in temporal cortex from a subject who sustained severe TBI.[2]

66.     A 2006 publication stated that "[a]ll standard U.S. guidelines, such as those first set by the American Academy of Neurology and the Colorado Medical Society, agree that athletes who lose consciousness should never return to play in the same game."

67.     In sum, the NCAA has known for decades that MTBI experienced in football can and does lead to long-term brain injury in football players, including, but not limited to, memory loss, dementia, depression, and CTE and its related symptoms.

68.     Finally, in 2010, the NCAA acted by adopting a concussion management policy that delegated the concussion problem to its member schools.  This public relations maneuver in the face of decades of knowledge coupled with inaction, was too little and too late to correct the inadequacies of its past conduct and its detrimental impact on former players.

**E.     The NCAA Fraudulently Concealed Information the Long-Term Effects of Repeated Head Impacts in Football.**

69.     As noted above, the NCAA knew of the head trauma risks of football for several decades, yet took no action to educate its football players of these risks.  Similarly, they took no action to provide medical monitoring to prevent, mitigate, monitor, diagnose, or treat these injuries.

70.     The August 2010 NCAA concussions management plan also failed to provide the necessary education and disclosure of head trauma risks needed medical monitoring and/or needed medical treatment to former players.

71.     Thus, the NCAA has concealed these risks and the need for medical monitoring of and/or medical treatment of the former players.

72.     Therefore, any applicable statute of limitations is tolled by the NCAA's deceitful and fraudulent conduct.

**F.** **Scientific and Medical Evidence Regarding the Need for Medical Monitoring and the Availability of Specific Medical Tests and Protocols for the Early Detection of Latent Brain Jury.**

73.     For decades, published peer-reviewed scientific studies have shown that repeated traumatic head impacts (including sub-concussion blows and concussions) cause ongoing and latent brain injury. Such brain injury has been documented as a result of various causes, including sports-related head impacts in both football and boxing.

74.     Neuropathology studies, brain imaging tests, and neuropsychological tests on many former football players have established that football players who sustain repetitive head impacts while playing the game have suffered and continue to suffer brain injuries that result in any one or more of the following conditions: early onset Alzheimer's disease, dementia, depression, deficits in cognitive functioning, reduced processing speed, attention, and reasoning, loss of memory, sleeplessness, mood swings, personality changes, and CTE.

75.     Repeated traumatic head impacts suffered by former football players have a microscopic and latent effect on the brain. These impacts twist, shear, and stretch neuronal cells such that multiple forms of damage take place, including the release of small amounts of chemicals within the brain, such as the Tau protein. Among other things, the gradual buildup of Tau protein – sometimes over decades – causes CTE, which is the same phenomenon as boxer's encephalopathy (or punch drunk syndrome), which was studied and reported in the Martland study in 1928. CTE is also associated with an increased risk of suicide, dementia, and a progressive cognitive decline and dysfunction.

76.     Accordingly, the repeated traumatic head impacts suffered by former NCAA football players exposed them to a subtle and repetitive change within the brain on the cellular

level including increased levels of the Tau protein which is known to increase the risk of brain injury.

77.     Plaintiff was exposed to a significant number of sub-concussive blows and concussions as a result of his college football career.  The general public does not experience this type of brain trauma.

78.     Historically, the NCAA has dismissed repeated sub-concussive blows and concussions as "dings" and having one's "bell rung," and concealed facts that would have assisted the Plaintiff in being able to obtain adequate brain injury diagnosis, management, and treatment to facilitate recovery and rehabilitation before his diagnosis of early-onset Alzheimer's.

79.     The Defendant's inaction and denial as to the risks of chronic sub-concussive blows and concussions was a proximate cause of Plaintiff's brain injury and its sequelae including cognitive, mental health, and neurological disorders during the years following his college football career.

80.     Management of concussions requires a gradual, multistep process involving baseline testing and neuro-cognitive examination in a timely fashion.

81.     For sports, such as football, in which repeated blows to the head are unavoidable, proper concussion assessment and management is and was paramount for preventing and mitigating long-term consequences.

82.     The NCAA's inaction in the face of overwhelming scientific research denied the Plaintiff the benefit of medical monitoring for latent brain injury which would have identified deficits that were amenable to treatment through medical, cognitive, psychological and behavioral counseling (for the patent and his spouse and family), as well as through

pharmaceutical treatment, lifestyle modifications, and other therapeutic interventions, which failure and inaction is a proximate cause of Plaintiff's injury and disease.

83.     Serial testing of cognitive functioning for early signs or symptoms of neurologic dysfunction, and serial brain imaging for signs of injury or disease, is medically necessary to assure early diagnosis and effective treatment of brain injury.

84.     Medical monitoring for latent brain injury is highly specialized and different from the medical care that is normally recommended to other men of a similar age, in the absence of a history of chronic repeated sub-concussive impacts and concussions, and the failure to provide such case was negligence.

85.     Well-established and specialized medical monitoring procedures existed to provide early diagnosis of brain injury which greatly enhances successful treatment, rehabilitation, and prevention or mitigation of cognitive, psychological, and behavioral deficits, including, early-onset Alzheimer's.

86.     Such procedures include serial brain imaging studies and neuropsychological evaluations targeted on identifying the deficits associated with chronic and repeated sub-concussive blows and concussions experience by Plaintiff.

87.     Medical monitoring for latent brain injury is reasonably necessary to provide for early diagnosis, leading to benefits in treatment, management, rehabilitation, and prevention or mitigation of damage, the failure of the NCAA to provide medical monitoring to Plaintiff was negligence and a proximate cause of the development of his early-onset Alzheimer's.

## VI.     CAUSES OF ACTION

### COURT I

#### Negligence

88.     Plaintiff repeats and re-alleges each of the allegations contained in the foregoing paragraphs.

89.     Plaintiff seeks to recover damages for past and future medical care for his early-onset Alzheimer's.

90.     During his NCAA career, Plaintiff experienced repeated traumatic head impacts, including sub-concussive blows and concussions, with greater frequency and severity than the general population of men of a similar age.

91.     The repeated traumatic head impact injuries, including sub-concussive blows and concussions, experienced by Plaintiff are known and proven to be hazardous because they increase the risks of developing neurodegenerative disorders and diseases, including but not limited to CTE, MCI, Alzheimer's disease and other similar cognitive-impairing conditions.

92.     Defendant was fully aware of – yet concealed the dangers of exposing players, including Plaintiff, to – increased risks of repeated traumatic head impacts and developing neurodegenerative disorders and diseases.  Defendant had a duty to protect the health and safety of NCAA football players.  Defendant failed to educate its football players regarding the risks of repeated head trauma in football, and failed to require actions to prevent, mitigate, monitor, diagnose, and treat brain injuries.  By such negligent conduct, Defendant breached their duty of care to the Plaintiff and caused the increased risks to Plaintiff giving rise to his development of early-onset Alzheimer's.

21

93.     As a proximate result of NCAA's negligent conduct, Plaintiff has experienced increased risks of the sequelae of repeated traumatic head impacts, including developing serious latent neurodegenerative disorders and diseases, including but not limited to CTE, MCI, and Alzheimer's disease.

94.     Monitoring procedures existed that comported with contemporary scientific principles that made possible early detection of the cognitive impairments and conditions that Plaintiff was at an increased risk of developing.  Such monitoring, which included but was not limited to baseline exams, diagnostic exams, and behavioral and pharmaceutical interventions, would have prevented or mitigated Plaintiff's injuries, and enable treatment of the adverse consequences of the latent neurodegenerative disorders and the development of early-onset Alzheimer's disease associated with the repeated traumatic head impacts described herein.

95.     The monitoring procedures set forth above are fundamentally different from and more extensive than the normally prescribed medical treatment and/or diagnostic procedures for adult males.

96.     As set forth above, the monitoring procedures were reasonably necessary according to contemporary scientific principles, to enable Plaintiff to obtain early detection and diagnosis of the early-onset Alzheimer's that he was at an increased risk of developing as a result of Defendant's tortious conduct described herein.

## COUNT II

### Gross Negligence

97.     Plaintiff repeats and re-alleges each of the allegations contained in the foregoing paragraphs.

98.     This count is based upon Defendant's reckless endangerment of Plaintiff and the Class.

99.     The NCAA has historically assumed a duty to protect the health and safety of its football players.

100.    By taking such steps to protect the health and safety of its players, a relation of trust and confidence between the NCAA and its players exists, which gave rise to a duty upon the NCAA not to conceal material information to its players, and to act to protect the health and safety of its players, including Plaintiff and the Class.

101.    The NCAA had superior knowledge of such material information concerning the increased risks of repeated traumatic head impacts to its players, such material information was not readily available to the Plaintiff, and the NCAA knew or should have known that the Plaintiff and the Class were acting and playing based upon mistaken beliefs created by the NCAA's concealment, inaction, and denial.

102.    The NCAA players, including Plaintiff, did reasonably and justifiably rely upon the NCAA to protect their health and safety.

103.    The NCAA's grossly negligent conduct caused Plaintiff and the Class to act without taking adequate steps to prevent or mitigate the latent brain injury damage.

23

104.    As a result of the NCAA's grossly negligent conduct as alleged here, Plaintiff and the Class were exposed to the increased risks as set forth above, during and subsequent to their NCAA football careers.

105.    As a result of the NCAA's grossly negligent conduct as alleged herein, Plaintiff and the Class were recklessly endangered during and subsequent to their playing careers. Plaintiff and the Class are entitled to punitive damages as allowed by law, from the NCAA, as a result of the NCAA's reckless and grossly negligent conduct.

## COUNT III

### Breach of Contract

106.    Plaintiff repeats and re-alleges each of the allegations contained in the foregoing paragraphs.

107.    Plaintiff and the NCAA were parties to a contract by virtue of the NCAA's requirement that each student-athlete complete a form affirming that he has read and will abide by the NCAA regulations, which expressly encompass the NCAA Constitution, Operating Bylaws, and Administrative Bylaws (collectively, "NCAA Regulations").

108.    In the NCAA Regulations, the NCAA expressly promises to enforce the requirement that "each member institution protect the health of, and provide a safe environment for, each of its participating study athletes," NCAA Const. Art. 2, §2.2.3.

109.    Furthermore, in the NCAA Sports Medicine Handbook, the NCAA explicitly states that "student-athletes rightfully assume that those who sponsor intercollegiate athletics have taken reasonable precautions to minimize the risks of injury from athletics participation."

110.    The NCAA has breached its contractual commitment to former NCAA football players, including Plaintiff, by failing to educate football players about the long-term, life-

24

altering risks and consequences of head impacts in football; by failing to establish known protocols to prevent, mitigate, monitor, diagnose, and treat brain injuries; and by failing to go back to its former NCAA football players to offer education and needed medical monitoring.

111.    To the extent that the Court finds that no contract exists between Plaintiff and the NCAA, then the NCAA and its member institutions were parties to a contract.  As an express condition of their membership in the NCAA, each institution must agree to abide by all NCAA Regulations.  These NCAA Regulations thus constitute a contract between the NCAA and its member institutions.

112.    Plaintiff and the Class are third-party beneficiaries of the contracts between the NCAA and its members because the parties to the contracts intended to benefit student-athletes through provisions of the contract, including the following provision of the NCAA Constitution:

> **2.2.3   Health and Safety.**
> It is the responsibility of each member institution to protect the health of, and provide a safe environment for each of its participating student-athletes.  *(Adopted: 1/10/95.)*

113.    The NCAA breached this contract by failing to enforce the requirement that each institution protect the health of student-athletes.  This breach was effectuated by the NCAA's failure to educate football players about the long-term, life-altering risks and consequences of head impacts in football; to establish known protocols to prevent, mitigate, monitor, diagnose, and treat brain injuries; and to go back to its former NCAA football players and offer education and needed medical monitoring.

114.    Plaintiff therefore seeks damages for breach of contract based upon the failure to fund a comprehensive medical monitoring program for former college football players which would have facilitated the early diagnosis and adequate treatment of Plaintiff's neurodegenerative disorder and early-onset Alzheimer's disease.

## VII.  DAMAGES

115.    As a producing, direct and proximate result of the NCAA's negligence and gross negligence, Plaintiff and the Class sustained injuries and damages for which they are entitled to including general, special, economic and non-economic in an amount in excess of the minimal jurisdictional limits of the court, as determined to be just and fair by the jury.  Such damages include, but are not limited to:

      a.      Physical pain and mental anguish in the past and future;

      b.      Physical impairment in the past and future;

      c.      Medical care in the past and future;

      d.      Loss of income in the past and future;

      e.      With respect to all counts proposed in this Complaint, damages in excess of $75,000.00 for pain and suffering in the past and future;

      f.      With respect to all counts, awarding Plaintiff his costs and disbursements in this action, including reasonable attorney's fees, to the extent permitted by law; and

      g.      With respect to all counts, granting Plaintiff such other and further relief as may be appropriate.

## VIII.  DEMAND FOR JURY TRIAL

116.    Plaintiff demands a trial by jury on all matters so triable.

## PRAYER

WHEREFORE, Plaintiff prays that Defendant be cited to appear and answer herein, as the law directs, and upon final hearing thereof, Plaintiff have and recover judgment from the Defendant for damages in such amounts as the evidence may show proper at the time of trial,

together with pre-judgment and post-judgment thereon at the maximum legal rate allowed by law, cost of court, attorney's fees, and for such other further relief, both general and special, at law or in equity, to which Plaintiff may be justly entitled.

Respectfully submitted,

*/s/ Dwight E. Jefferson*

By:_____
Dwight E. Jefferson
State Bar No. 10605600
djefferson@coatsrose.com

**ATTORNEYS FOR PLAINTIFF**

OF COUNSEL:

COATS ROSE YALE RYMAN & LEE
9 Greenway Plaza, Suite 1100
Houston, Texas 77046-0307
Telephone:      (713) 651-0111
Facsimile:      (713) 651-0220